UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.:0:22-cv-60707

THE SCHOOL BOARD OF BROWARD
COUNTY, FLORIDA,

       Plaintiff,

vs.

J.C., a minor,

       Defendant.

_____/

## COMPLAINT PURSUANT TO THE INDIVIDUALS
## WITH DISABILITIES EDUCATION ACT

Plaintiff, SCHOOL BOARD OF BROWARD COUNTY, FLORIDA ("School Board" or
"Plaintiff"), by and through its undersigned counsel, files this civil action against J.C., a minor
("J.C." or "the Student"), and states as follows:

### INTRODUCTION

1.    This is an action by the School Board under the Individuals with Disabilities
Education Act ("IDEA"), as amended, 20 U.S.C. § 1400, *et. seq.*, and the Florida Statutes
concerning a student with disabilities.  The School Board seeks review and reversal of an
Amended Final Order entered by an Administrative Law Judge ("ALJ") of the Florida Division of
Administrative Hearings ("DOAH").   A copy of the subject the Amended Final Order is attached
hereto as **Exhibit A**.

2.    The School Board seeks *de novo* review and declaratory relief, reversing those
portions of the ALJ's Amended Final Order on which the School Board did not prevail at the due
process hearing, including without limitation:

(i)      The finding that the School Board failed to materially implement the June 2020 Interim Individual Education Plan ("IEP") between June 2020 and January 2021;

(ii)      The finding that the School Board denied the Student's family meaningful participation in the January 12, 2021, IEP meeting; and

(iii)      The finding that J.C. was entitled to compensatory education for each full day of school between June 2020 and January 2021.

## JURISDICTION & VENUE

3.      This Court has jurisdiction over the Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), (4), and 20 U.S.C. §§ 1415(i)(3)(A).

4.      The Plaintiff's claims are authorized by 20 U.S.C. § 1415(i)(2)(A), and   34 C.F.R. § 104.36, without regard to the amount in controversy.

5.      Venue is proper in the Southern District of Florida because all parties reside in, and the actions complained of in this civil action occurred in Broward County, Florida.

## PARTIES

6.      The Plaintiff School Board is a governmental entity organized and existing under the laws of the State of Florida which operates the public schools in Broward County, Florida. As such, the School Board provides special education and related services under Part B of the IDEA.

7.      Defendant, J.C., a minor, is enrolled in the Broward County School District ("District") and attends Cypress Bay High School ("CBHS").

## BACKGROUND

8.      The IDEA provides federal funding to assist state and local educational agencies in educating children with disabilities.   See 20 U.S.C. §§ 1400 et seq.; Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176, 102 S. Ct. 3034 (1982); Endrew F.

2

v. Douglas County Sch. Dist. RE-1, 580 U.S. ___, 137 S.Ct. 988 (2017). The purpose of the IDEA is, in part, "to ensure that all children with disabilities have available to them a free appropriate public education ('FAPE') that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living." 20 U.S.C. § 1400(d)(1)(A); 34 C.F.R. § 300.1(a).

9.      The individualized education plan ("IEP") is "the centerpiece of the statute's education delivery system for disabled children." Honig v. Doe, 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). To "meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F., 137 S. Ct. at 999.

10.      The IDEA defines a "child with a disability" as a child with a specified condition and "who, by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3)(A)(i), (ii) (emphasis added); 34 C.F.R. § 300.8(a). "Special education" means "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability…." 20 U.S.C. § 1401(9); see also 34 C.F.R. § 300.39(a)(1).

11.      IDEA regulations further define "specially designed instruction" as "adapting, as appropriate …, the content, methodology or delivery of instruction – (i) [t]o address the unique needs of the child that results from the child's disability; and (ii) [t]o ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children." 34 C.F.R. § 300.39(b)(3)(i), (ii).

12.      To be considered a child with a disability under the IDEA, a student must be found to have a qualifying condition and, because of that condition, be in need special education. 20

U.S.C. § 1401(3)(A). The IDEA obligates school districts to base eligibility decisions on a variety of "relevant functional, developmental and academic information about the child, including information provided by the parent...." 20 U.S.C. § 1414(b)(2)(A).

13.     The IDEA defines an IEP as "a written statement for each child with a disability that is developed, reviewed, and revised" according to specific procedures and that includes a roadmap for the child's academic growth and development. 20 U.S.C. § 1414(d)(1)(A)(i).   The IEP is a "plan" that "requires a prospective judgment by school officials," and crafting it is a "fact-intensive exercise."  Endrew F., 137 S. Ct. at 999.  Parents and educators work together as the "IEP Team" to draft and update a child's IEP, with the IDEA laying out both the general IEP process and a checklist of items that the plan should include—things like "a statement of the child's present levels of academic achievement and functional performance," "a statement of measurable annual goals," and "a statement of the special education and related services and supplementary aids and services ... to be provided to the child." 20 U.S.C. § 1414(d)(1)(A)(i), (d)(1)(B). See generally id. § 1414.

14.     The IDEA allows parents (or a student who has reached the age of majority) to bring challenges to the "identification, evaluation or educational placement of the child, or the provision of a [FAPE] to [the] child" by filing a due process complaint. 20 U.S.C. § 1415(b)(6), (c)(2)(A). Under the IDEA, the burden of proof in an administrative hearing challenging an IEP or its implementation is properly placed upon the party seeking relief, whether that is the disabled child or the school district. 20 U.S.C. § 1400 et seq.; Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 126 S. Ct. 528, 163 L. Ed. 2d 387 (2005).   The decision of the administrative hearing officer is final unless appealed. 20 U.S.C. § 1415(i)(1); 34 C.F.R. §§ 300.514(a).

4

15.     Any party aggrieved by the final order of the hearing officer may bring a civil action in a state or federal court for review of the disputed order.   20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516. 24.   When a district court reviews the hearing officer's ruling, "it must make a decision based on the preponderance of the evidence and give due weight to the ALJ's conclusions." L.J. ex rel. N.N.J. v. School Board of Broward Cty., 927 F.3d 1203, 1210 (11th Cir. 2019) (quotation omitted); J.N. next friend of M.N. v. Jefferson Cty. Bd. of Educ., 12 F.4th 1355, 1365 (11th Cir. 2021).   In an IDEA action challenging the findings and decision of an ALJ, the burden of proof lies with the party challenging the decision.   See Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005); Loren F. ex rel. Fisher v. Atlanta Indep. Sch. System, 349 F.3d 1309, 1313 (11th Cir. 2003).

16.     "In a judicial proceeding under the IDEA, a reviewing court is required to conduct a modified de novo review, giving 'due weight' to the underlying administrative proceedings." M.L. v. Fed. Way Sch. Dist., 341 F.3d 1052, 1061 (9th Cir.), opinion withdrawn, 351 F.3d 957 (9th Cir. 2003) (citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)); Sch. Bd. of Broward Cty., Fla. v. C.B., 315 F. Supp. 3d 1312, 1317 (S.D. Fla. 2018).   The Court "[m]ust be careful not to substitute its judgment for that of the state educational authorities." Walker Cnty. Sch. Dist. v. Bennett, 203 F.3d 1293, 1297 (11th Cir.2000).

17.     Although district courts must afford judicial deference to the local administrative agency judgment, such deference is "[t]ypically limited to matters calling upon educational expertise." Loren, 349 F.3d at 1314 n.5 (citation omitted). "But the ALJ is not entitled to blind deference. The District Court is free to accept the ALJ's conclusions that are supported by the

record and reject those that are not ... At the same time, when the District Court rejects the ALJ's conclusions, it is obliged to explain why." R.L. v. Miami–Dade Cty. Sch. Bd., 757 F.3d 1173, 1178 (11th Cir. 2014) (internal quotations and quotation marks omitted).

### A Failure to Implement

18.     In "implementation case[s], reviewing courts must assess whether the school has provided special education and related services 'in conformity with' a disabled child's IEP, not whether that IEP was appropriate to begin with."   L.J. by N.N.J. v. Sch. Bd. of Broward Cnty., 927 F.3d 1203, 1216 (11th Cir. 2019) (citing 20 U.S.C. § 1401(9)(D)).

19.     "[T]o prevail in a failure-to-implement case, a plaintiff must demonstrate that the school has materially failed to implement a child's IEP.   And to do that, the plaintiff must prove more than a minor or technical gap between the plan and reality; de minimis shortfalls are not enough. A material implementation failure occurs only when a school has failed to implement substantial or significant provisions of a child's IEP."   L.J., 927 F.3d at 1211.

20.     "Under that standard, students and parents can be assured that they will receive the benefits of a properly designed IEP, while schools work to meet those requirements without being inappropriately penalized for de minimis failures that do not themselves deprive a student of the educational promise of the IDEA."   Id.

21.     "[T]he focus in implementation cases should be on 'the proportion of services mandated to those actually provided, viewed in context of the goal and import of the specific service that was withheld.'"   Id. at 1214 (L.J., 850 F. Supp. 2d at 1320).   "The task for reviewing courts is to compare the services that are actually delivered to the services described in the IEP itself. That means that courts must consider implementation failures both quantitatively and

qualitatively to determine how much was withheld and how important the withheld services were in view of the IEP as a whole." Id.

22.     "A child's actual educational progress (or lack thereof) can be evidence of the materiality of an implementation failure—but it is not dispositive." Id.

### A Lack of Parent Participation

23.     Parent participation in the IEP process is important to effectuating the purpose of the IDEA. See 20 U.S.C. § 1414(d)(1)(B)(i) (requiring inclusion of parents in the IEP team). "The IDEA itself and its implementing regulations memorialize the importance of this participation." A.L. v. Jackson Cty. Sch. Bd., 635 F. App'x 774, 779–80 (11th Cir. 2015). "Indeed, 34 C.F.R. § 300.322, entitled "Parent Participation," generally provides that a school board must take steps to ensure that one or both parents of a child with a disability are present at each IEP meeting or are afforded the opportunity to participate." Id.

24.     "Moreover, the Supreme Court has emphasized that the IDEA's structure relies upon parent participation in developing successful IEPs." A.L., 635 F. App'x 774, 779–80 (citing Rowley, 458 U.S. at 206, 102 S.Ct. 3034 ("Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, as it did upon the measurement of the resulting IEP against a substantive standard.")).

25.     "Although parent participation in the development of IEPs is important, the IDEA's implementing regulations provide for instances in which a school board may conduct an IEP meeting in the absence of the parent." A.L., 635 F. App'x at 779–80. Specifically, 34 C.F.R. § 300.322(d) states,

(d) Conducting an IEP Team meeting without a parent in attendance. A meeting may be conducted without a parent in attendance if the public agency is unable to convince the parents that they should attend. In this case, the public agency must keep a record of its attempts to arrange a mutually agreed on time and place, such as—

(1) Detailed records of telephone calls made or attempted and the results of those calls;

(2) Copies of correspondence sent to the parents and any responses received; and

(3) Detailed records of visits made to the parent's home or place of employment and the results of those visits.

34 C.F.R. § 300.322(d).   "So if a parent refuses to attend an IEP meeting or takes actions that are equivalent to refusing to attend an IEP meeting, the school board may hold the meeting without the parent in order to develop the child's IEP."   A.L., 635 F. App'x at 780.

## FACTUAL ALLEGATIONS

26.     J.C. is enrolled in the District and, during the 2020-2021 academic school year, was enrolled is in the ninth grade at Cypress Bay High School ("CBHS").

27.     J.C. was found eligible for exception student education ("ESE") services and his current eligibilities include Autism Spectrum Disorder, Intellectual Disability, and Language Impairment.

28.     J.C. is also diagnosed with Epilepsy and Angelman's Syndrome.

29.     J.C. is essentially non-verbal and communicates multi-modally, using gestures, utterances and with an Augmentative and Alternative Communication ("AAC") speech-generating device -- an I-pad tablet with the Proloquo2go application -- to communicate ("Device").

**The May 2020 Settlement Agreement**

30.     Following a 2019 request by J.C.'s mother ("Parent"), the Parent and the School Board participated in a state mediation to address the Parent's ongoing concerns regarding J.C.'s education.

31.     As a result of the state mediation process, the Parent and the School Board signed a mediated settlement agreement on May 7, 2020 ("Agreement").

32.     One requirement of the Agreement was that the Parent and the School Board would participate in an IEP meeting to revise the January 21, 2020, IEP.

33.     Pursuant to the Agreement, the School Board retained, Kelly Fonner, an expert on curriculum and AAC to assist the drafting of the June 2020 IEP, staff training on the use of AAC, and the implementation of the June 2020 IEP.

**The June 2020 Interim IEP**

34.     As required by the Agreement, the Parent and the School Board held an IEP meeting and created a new interim IEP, dated June 4, 2020, was created ("June 2020 Interim IEP"). A true and accurate copy of the June 2020 Interim IEP is attached hereto as **Exhibit B**.

35.     The Parent was in agreement with the content of the June 2020 Interim IEP.

36.     The June 2020 Interim IEP developed for J.C. was designed to be implemented only until the annual IEP, due in January 2021.

37.     J.C.'s June 2020 Interim IEP included specific strategies such as "aided language input," "descriptive teaching," "ECT," "AAC."

38.     Aided language input or stimulation is a research-based strategy used to model use of an AAC system to the AAC user.

9

39.     "Descriptive teaching" is using core or common words to describe and ask questions regarding a topic to allow the student to access the same words across settings.

40.     "ECT" is an acronym for Environmental Communication Teaching and is a research-based intervention which uses augmentative and alternative communication systems to increase a student's use of their symbolic system in a classroom and to teach adult communication partners strategies to increase communication of the student.

### Staff Training

41.     School staff working with J.C. received extensive training on the use of J.C.'s Device both before and during the 2020-2021 school year.

42.     During the 2020-2021 school year, staff training included formal training sessions at the beginning of the school year, coaching on an as-needed basis, and ECT training, which consisted of four sessions (in October, December, February and May) over the course of the 2020-2021 school year-.

### The 2020 Extended School Year

43.     The School Board began implementing the June 2020 Interim IEP in June 2020 during the 2020 Extended School Year ("ESY").

44.     J.C.'s academic experience -- like virtually all public-school students in the United States -- was impacted by the Covid 19 pandemic.

45.     When J.C. attended the 2020 ESY, J.C. was learning remotely like all students in the District.

46.     Due to J.C. being remote, the amount of academic services provided to J.C. during the 2020 ESY was reduced.

47.     J.C.'s 2020 ESY was extended for two weeks to make up that deficit.

### The 2020-2021 School Year

48.     When the 2020-2021, school year started in August 2020, J.C. attended CBHS, but like all students in the District continued to learn remotely as result of the Covid 19 pandemic.

49.     While students were permitted to return to in-person learning in October 2020, J.C. elected to continue with remote learning until April 2021.

50.     In addition to causing remote learning, the Covid 19 pandemic created staffing issues throughout the District.

51.     At CBHS, 32 teachers went out on leave, requiring substitutes. CBHS was also short of substitutes, clerks, and paraprofessionals.

52.     When schools reopened to accept students in the in-person setting in October 2020, more staff took leaves to avoid coming back to campus.

53.     J.C. was assigned to a Special Varying Exceptionality ("SVE,") classroom.

54.     Within the first few weeks of the start of the school board, J.C.'s assigned teacher took a Covid leave.

55.     A substitute teacher took over J.C.'s SVE classroom.

56.     The substitute teacher was supervised by a certified ESE teacher at all times.

57.     Although the J.C.'s assigned teacher was expected to return in several weeks, her Covid leave was extended on two separate occasions and she ultimately did not return to classroom teaching.

58.     As a result, the substitute teacher remained assigned to J.C.'s SVE classroom until a new teacher was hired in January 2021.

59.     In addition to his teacher, J.C. had two paraprofessionals who worked with him.

60.     The paraprofessionals working with J.C. remained consistent throughout the year.

61.     Staff at the District-level held weekly collaborative meetings to support J.C. and those teaching him.

62.     Staff at the District and school-levels attended monthly collaborative meetings with Ms. Fonner[1] to support J.C. and those teaching him.

63.     All monthly district collaborative summary statements regarding J.C. were sent electronically to the Parent.

64.     The School Board materially implemented J.C.'s June 2020 Interim IEP between August 2020 and January 2021.

65.     Different staff working with J.C. were assigned to implement different goals on the June 2020 Interim IEP and collected data on those goals.

66.     This data was then collected and reviewed by staff overseeing J.C.'s education including Fonner.

67.     Given the staffing change at the start of the 2020-2021 school year, goal implementation and data collection improved as the Fall 2020 semester progressed.

68.     During the Fall 2020 semester, J.C. was making progress on his June 20202 Interim IEP goals but not the progress which would result in mastery of a goal.

---

[1] Kelly Fonner is an expert on adaptive curriculum and assistive technology. J.C.'s parent identified Ms. Fonner as someone who could help J.C. with getting his AAC Device used in school. The School Board subsequently hired Ms. Fonner to improve the services the School Board would provide to J.C. for the 2020-2021 school year.

12

69.     As the Fall 2020 semester progressed, staffing work with J.C. began having concerns with the amount of progress J.C. was making and if all of the goals in the June 2020 Interim IEP were appropriate for him.

70.     J.C.'s progress on the June 2020 Interim IEP may be explained as follows:

(i)     For goal 1, J.C. was able to recognize actual sight words, but was not able to master all 15 words as the goal was written;

(ii)    For goal 2, J.C. made progress but not at the highest level;

(iii)   For goal 3, there were too many components to be able to accurately measure as one data point but J.C. made progress because instruction on the goal changed – he did the activity twice rather than once;

(iv)    On goal, 4 J.C. made progress because he could answer a question given the three choices;

(v)     As to goal 5, J.C. did not know the letter each day, but was making progress identifying his letters;

(vi)    Regarding goal 6, J.C. did not master producing 3-4 word responses, but was able to produce 2 or more communicative functions;

(vii)   With regard to goal 7, J.C. mastered the goal as it was written since he went from a goal 0 to 3 on the DWS;

(viii)  Goal 8 was not mastered since, while J.C. was making progress in he could make two meaningful exchanges using his Device, he required maximal assistance;

(ix)    Goal 9 was mastered because he could wait his turn and raise his hand;

(x)     As to goal 10, J.C. made progress but did not master.   Staff believed that the number of new sight words per month (15) was too many.

(xi)    Goal 11 was not mastered as his physical development and syndrome made the goal not feasible;

(xii)   Regarding goal 12, J.C. made progress because he was using calendar words in independent writing samples;

(xiii)  As to goal 13, J.C. made progress and likely mastered;

(xiv)   As to Goal 14, J.C. made progress but did master using the goal rubric of 4 out of 5 attempts;

(xv)    While Goal 15 was observed, not a lot of data was provided because this was a goal implemented in the home setting.

71.    Goal 16 -- "Given a physical education class and a structured hygiene curriculum, J.C. will independently undress and dress…" -- was not implemented because J.C. did not transition to PE and no one dressed out for PE as he continued with remote learning during the Fall 2020 semester.

72.    To staff, this information and the lack of consistent progress indicated that the June 2020 Interim IEP needed to be revised.

73.    Staff's concerns were confirmed in December 2020 when the results the psychological, occupational and speech language evaluations came in.

74.    The evaluations confirmed the data collected on the June 2020 Interim IEP and that changes needed to be made to the June 2020 Interim IEP.

75.     The School Board continued implementing the June 2020 Interim IEP through January 2021.

### The January 2021 IEP

76.     On December 5, 2020, the Parent signed a notice agreeing to a January 12, 2021, IEP meeting on December 5, 2020.

77.     Through the Fall 2020 semester, the Parent had been provided information and data on the implementation of the June 2020 Interim IEP and J.C.'s progress, including:

(i)      A daily home note which included information on the documentation of goals that required implementation across settings;

(ii)     Monthly District collaborative summary statements;

(iii)    A quarterly progress report in October 2020;

(iv)     Beginning in November 2022, weekly data on goal implementation; and

(v)      In December 2022, copies of psychological, occupational and speech language evaluations.

78.     The Parent also attended a meeting on December 17, 2020, where the results of the psychological, occupational and speech language evaluations were discussed.

79.     On December 5, 2020, an attorney representing the Parent and J.C. emailed the District demanding all of J.C.'s "educational records."

80.     However, the demand included many items which were not educational records as defined by federal and state law, including documents related to trainings, curriculum, emails, texts, and phone messages, and copies of items either in the Parent's possession or accessible by the Parent.

81.     On January 5, 2021, the District provided the Parent with a draft Annual IEP in preparation for the January 12, 2021, IEP meeting.

82.     Neither the Parent nor the attorney representing her and J.C. provided any feedback on the draft January 2021 Annual IEP.

83.     District staff worked over the 2020-2021 Winter Break to compile the records responsive to the December 5, 2020, document request.

84.     On January 8, 2021, the District produced 541 pages of educational records to the Parent.

85.     On Sunday, January 10, 2021, the attorney representing the Parent and J.C. emailed the District demanding 65 additional "records" to be supplied in advance of the January 12th IEP meeting.

86.     In reality, the Parent had already been provided the majority of the records demanded on January 10, 2021.

87.     In addition, and at the request of the Parent, the District created a graph to visually represent the date on Goal 2 of the June 2020 Interim IEP, pertaining to the use of target words during language therapy.   The graph compared how often J.C. used target words and how often he used target words with assistance.

88.     The graphs demonstrated that that J.C. required assistance using his target words; that J.C.'s behaviors, feelings and motivation influenced progress; and that, based on language samples taken at various points throughout the year, J.C. was not using core words consistently.

89.     The graphs supported the proposed goals in the draft Annual IEP.

90.     This graph was provided to the Parent on January 11, 2021.

16

91.     On 9:51 p.m. on January 11, 2021, the attorney representing the Parent emailed the District requesting an opportunity to discuss J.C.'s progress on his IEP goals at the January 12, 2021, IEP meeting.

92.     The School Board responded early on the morning of January 12, 2021, advising that it intended to proceed with IEP meeting as scheduled.

93.     Two days were set aside for the Annual January 2021 IEP meeting: January 12, 2021 and January 14, 2021.

94.     Jennifer Bergstrom, a speech language pathologist ("SLP") and required participant, was only available January 12, 2021.

95.     Holding an IEP meeting without her would have violated the Agreement and meant that a key participant was not present.

96.     The January 12, 2021, Annual IEP meeting -- being held at CBHS -- commenced with the Parent, J.C.'s father, J.C.'s stepfather, the attorney representing J.C. (collectively, "Family"), and all required School Board personnel present.

97.     The Family asked to review the progress on the June 2020 Interim IEP goals before commencing with the IEP meeting.

98.     The School Board proposed to review J.C.'s progress on his IEP goals as part of the drafting of the Present Levels of Performance, the first step in preparing an IEP.

99.     If at the end of the meeting the Family was not satisfied with the exchange of the information, the School Board proposed utilizing the already-scheduled January 14, 2020, date to review old goal data.

100.     The Family did not agree with this Proposal.

101.    Alternatively, the School Board offered to meet until noon and then to review J.C.'s progress on his IEP goals if the Family was not satisfied with the exchange of information.

102.    After a break, the Family advised that they did not believe they had sufficient information to proceed, were electing to leave the meeting, and would not participate in the creation of a new Annual IEP.

103.    Prior to the Family departing, the School Board advised that it intended to proceed with the IEP meeting and develop an Annual IEP despite the Family's absence.

104.    After the Family left the meeting, the School Board continued with the process of drafting a new Annual IEP.

105.    The School Board elected to continue with IEP meeting because (1) J.C. was not making sufficient progress on his IEP goals in the two quarters preceding the IEP meeting and (2) the Family had access to all the goal data.

106.    Following the Family's departure, the IEP team continued with the process of drafting a new IEP, including reviewing the present levels of performance, discussing the primary educational need in each area, and collaboratively developing goals.

107.    The IEP team took into consideration the concerns previously voiced by the Family in drafting the new Annual IEP.

108.    The IEP team ultimately elected to modify the goals on the January 12, 2021, because while J.C. has been making some progress on the June 2020 Interim IEP goals, he was not progressing enough to master them.

109.    The Parent did not object to the January 12, 2021, Annual IEP until March 5, 2021, when the Parent on behalf of J.C., filed a due process request.

110.    As a result, the School Board began implementing the January 2021 IEP in January 2021.

111.    In advance of the start of the Spring 2021 semester in January 2021, CBHS hired a new SVE teacher to take over J.C.'s class.

112.    Initially, funding did not exist for this position, but the administration at CBHS elected to move funding earmarked for a different position so that a certified ESE teacher could be assigned to J.C.'s classroom.

113.    On January 4, 2021, the new certified ESE teacher transitioned into J.C.'s SVE classroom as the ESE Teacher.

114.    She received training on aided language input, descriptive teaching, ECT strategies and use of the Device prior to transitioning.

115.    The School Board implemented the January 12, 2021, Annual IEP for almost two months.

116.    Data collected during this period demonstrated that the goals on the January 12, 2021, Annual IEP were more appropriate for J.C. than those on the June 2020 Interim IEP.

### The Administrative Proceedings

117.    On March 5, 2021, J.C. requested a due process hearing before a Florida ALJ through DOAH.

118.    DOAH commenced an administrative proceeding and assigned it Case No.: 21-0862.  (hereinafter referred to as "Administrative Proceeding").

119.    On March 16, 2021, J.C. filed a Motion to Determine Stay Put Placement During the Pendency of this Action ("Motion for Stay Put"), asking that the ALJ determine that the June

2020 Interim IEP should be reinstated during the pendency of the Administrative Proceeding as the Student's "stay put" placement.

120.    Following a hearing, the ALJ entered an Order on Stay Put Placement, ruling in favor of Student and ordering that the June 2020 Interim IEP be implemented while the Administrative Proceeding progressed.

121.    On May 3, 2021, the School Board filed a "Notice of Submission of the Section 504 Allegations for Consideration in the Due Process Hearing Scheduled for J.C.," agreeing to have the Section 504 allegations heard during the due process hearing.

122.    The administrative hearing in the Administrative Proceeding was held live from June 8 through 10, 2021, and from September 20 through 24, 2021, and was finished by Zoom conference on October 22, 2021.

123.    During the hearing, J.C. called 13 witnesses and the School Board called 6 witnesses.

124.    Before the ALJ were the following issues: (1) whether the School Board denied the student a FAPE by failing to materially implement J.C.'s June 2020 Interim IEP, during the period of June 2020 to January 2021; (2) whether J.C.'s parents were denied the ability to meaningfully participate in the process of drafting the January Annual 2021 IEP; and (3) whether the School Board discriminated against J.C. on the basis of his disability in violation of section 504.

125.    On January 18, 2022, the ALJ entered the Final Order in the Administrative Proceeding finding against the School Board on the IDEA claims.

126.    On February 7, 2022, the ALJ entered an Amended Final Order correcting an error in the calculation in the amount of compensatory services ordered.

127.     The ALJ found that the School Board (1) failed to meaningfully implement J.C.'s IEP between June 2020 and January 2021, and (2) denied the Parent meaningful participation when it drafted a new IEP in January 2021.

128.     As relief, the ALJ ordered (1) that J.C. was entitled to compensatory education for each full day of school between June 2022 and January 2021 and (2) that the School Board must convene a meeting to draft a new IEP.    Ex. 1 (Amended Final Order) at ¶¶ 69-70.

129.     The ALJ erred in following ways:

(i)      By improperly placing the burden of proof on the School Board during the Administrative Proceeding;

(ii)      By employing the wrong test in determining whether the School Board failed to materially implement the June 2020 Interim IEP;

(iii)      By finding that the School Board failed to materially implement the June 2020 Interim IEP;

(iv)      By finding a lack of meaningful parent participation in the January 12, 2021, IEP meeting where the Family voluntarily left the IEP meeting based on a pretext of needing additional information;

(v)      By finding that J.C. was entitled to compensatory education for each full day of school between June 2022 and January 2021;

(vi)      By failing to consider the undisputed testimony regarding academic progress between June 2020 and January 2021;

(vii)      By concluding that the Device was JC's predominant communication mode without sufficient evidentiary support;

(viii) By failing to consider that J.C.'s substitute teacher was supported and supervised by an ESE Certified teacher;

(ix) By failing to credit the School Board for services provided by the speech language pathologist and occupational therapist, where the evidence established they provided their services in conformance with June 2020 Interim IEP;

(ix) By giving the Family a de facto veto power over the creation of a new IEP;

(x) By failing to consider the records and data provided to the Family over the course of the Fall 2020 semester;

(xi) By concluding without sufficient evidentiary support that the School Board failed to train staff regarding the use of the Device and to have a sufficient number of Devices available.

130. The School Board is an aggrieved party entitled to obtain review of the Amended Final Order of the ALJ.

131. All conditions precedent to maintaining this action have occurred, been satisfied, or otherwise been waived.

## COUNT I - DE NOVO REVIEW

132. The School Board repeats and realleges the allegations in paragraphs 1 through |131|[SJH1] of the Complaint as if fully set forth herein.

133. The School Board is entitled to de novo review of those parts of the Amended Final Order for which it is the aggrieved party.

**WHEREFORE**, Plaintiff, SCHOOL BOARD OF BROWARD COUNTY, FLORIDA, requests a de novo review of the Amended Final Order and demand judgment against the Defendant, and requests this Court:

22

       (i)       Reverse the decision of the ALJ that found that the School Board failed to materially implement J.C.'s June 2020 Interim IEP between June 2020 and January 2021;

       (ii)      Reverse the decision of the ALJ that found that the School Board the Parent meaningful participation when it drafted a new IEP in January 2021;

       (iii)     Reverse the decision of the ALJ finding that J.C. was entitled to compensatory education for each full day of school between June 2022 and January 2021;

       (iv)     Grant all costs of this suit to the School Board;

       (v)      Grant reasonable attorneys' fees to the School Board, to the extent provided by applicable law; and

       (vi)     Grant such other and further relief as the Court may deem just and proper.

Dated:  April 11, 2022

                   */s/ Hudson C. Gill*
                   HUDSON C. GILL
                   Fla. Bar No. 15274
                   *Attorneys for Respondent*
                   JOHNSON, ANSELMO, MURDOCH,
                   BURKE, PIPER & HOCHMAN, PA
                   2455 E. Sunrise Blvd., Ste. 1000
                   Fort Lauderdale, FL 33304
                   Tel: 954-463-0100
                   Hgill@jambg.com
                   Diaz@jambg.com

**SERVICE LIST**

Stephanie Langer, Esq.
Disability Independence Group, Inc.
2990 S.W. 35th Avenue
Miami, FL 33133
(305) 669-2822
slanger@justdigit.org
Attorney for Petitioner in the Administrative Proceeding

Susan J. Hofstetter, Esq.
Office of the General Counsel
The School Board of Broward County, Florida
K.C. Wright Administration Building
600 Southeast Third Avenue - 11th Floor
Fort Lauderdale, Florida 33301
Telephone: (754) 321-2050
Facsimile: (754) 321-2705
susan.hofstetter@browardschools.com
Attorney for THE SCHOOL BOARD

Hudson Gill, Esq.
Michael Burke, Esq.
Johnson, Anselmo, Murdoch, Piper & Hochman, P.A.
2455 East Sunrise Boulevard
Suite 1000
Fort Lauderdale, Florida 33304
Telephone: (954) 463-0100
Facsimile: (954) 463-2444
hgill@jambg.com
burke@jambg.com
diaz@jambg.com
cardona@jambg.com
Attorneys for THE SCHOOL BOARD